**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Dependency of:<br><br>G.M.W.,<br><br>    A Minor Child. | No. 82918-1-I<br><br>PUBLISHED OPINION |

ANDRUS, C.J. — The father of G.M.W. appeals an order denying his CR 60 motion to vacate a default order of dependency. He contends the Department of Children, Youth and Family (the Department) failed to serve him with the summons and dependency petition as required by RCW 13.34.070, RCW 4.28.080, and CR 4(c). He separately argues the trial court violated the Indian Child Welfare Act (ICWA)[1] and the Washington Indian Child Welfare Act (WICWA)[2] by failing to appoint an attorney to represent him before he appeared to request one. Finally, he contends the trial court failed to find that the Department engaged in active efforts to prevent the breakup of G.M.W.'s family.

We conclude the father was properly served with the summons and petition through substitute service under RCW 4.28.080(16) and that neither ICWA nor

---

[1] 25 U.S.C. § 1901 *et seq.*

[2] RCW ch. 13.38.

No. 82918-1-I/2

WICWA require the appointment of counsel until the parent appears, requests the appointment of counsel, and demonstrates indigency. Finally, we conclude the trial court made active effort findings at the dependency, disposition, and first review hearings and that there is substantial evidence to support the court's findings. We therefore affirm.

FACTS

On January 7, 2021, C.A., an enrolled member of the Upper Skagit Tribe (Tribe) gave birth to G.M.W. at Skagit Valley Hospital. The mother tested positive for opiates at the hospital and reported exposing G.M.W. to heroin and methamphetamine in utero. The mother reported using heroin up until three days prior to delivery. G.M.W. was born preterm at 35 weeks gestation after exposure to these substances throughout the mother's pregnancy during which she received no prenatal care.

The hospital notified the Department of G.M.W.'s birth on January 8, 2021. They reported that G.M.W. was showing signs of withdrawal, had "jerking movements" in his arms, and was having a difficult time latching onto a bottle nipple. Department social worker Faber went to the hospital that day for an initial face-to-face visit, to gather information about G.M.W. and to engage the child's parents in services. Neither the mother nor father were present. The hospital informed Faber that the mother had visited the baby and assisted with a morning feeding but then left and did not return. Faber met with the child's pediatrician who reported he may need to administer morphine to G.M.W. to combat withdrawal symptoms.

- 2 -

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 82918-1-I/3

The Tribe's social worker, Felice Keegahn, received an Intake Report regarding G.M.W. the same day. This report indicated that the mother had expressed an interest in parenting the child but had an appointment the following day at a drug treatment facility. Faber called Keegahn after she visited the hospital to provide a status report on the infant's medical condition and treatment. Keegahn informed Faber that both parents were enrolled members of the Tribe and that G.M.W. was eligible for enrollment as well.

On January 9, 2021, the hospital diagnosed G.M.W. with neonatal abstinence syndrome and oxygen desaturation. The baby's umbilical cord tested positive for both amphetamines and heroin.

The Department was aware that the mother had a lengthy history of heroin use that affected her ability to parent. The Department and the Tribe had worked with her for years to assist with her parenting of three other children, none of whom resided with the mother. Dependency proceedings were then pending for two of C.A.'s three children and the Department and Tribe's child protection team had attempted to engage the mother in drug treatment and mental health treatment since at least 2016.[3] According to the Department, C.A. had demonstrated an inability to adequately assess the medical and dental needs of her other children and had been unable to maintain stable housing or provide food and clothing for them. By December 2020, just months before G.M.W.'s birth, the Department informed the court that the mother was not engaged in services, despite its efforts

---

[3] G.W., the father here, is not the biological father of C.A.'s other children.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 82918-1-I/4

and those of the Tribe. She had not visited two of her three older children since the Department took them into care in 2016.

The Department had little information about G.M.W.'s father, G.W. It reported that he had two other children who resided with their mother, but it does not appear that these children were in dependency proceedings or that the father had ever been involved in receiving services through the Department. It determined that the father had past convictions for theft and pending criminal charges in superior court for identity theft, theft, and driving under the influence. The Tribe reported that the father was then facing additional charges in tribal court for assaulting a tribal officer, reckless endangerment, and possession of drugs and drug paraphernalia. The Department confirmed there were open arrest warrants for the father from both the superior and tribal courts.

Department social worker Nicole Patterson began working on G.M.W.'s case shortly after his birth. On January 11, 2021, she learned from the hospital social worker that the mother had come to the hospital to provide overnight feedings to G.M.W. and had an appointment that morning at Didgʷàlic, a treatment facility. Patterson also learned that the father had been present at the hospital but was there much less frequently than the mother.

Also on January 11, 2021, Patterson attempted to reach both parents via telephone, at phone numbers listed in the department intake report, without success. She left a voice mail message for the father. She also searched Facebook and found five accounts in the father's name. She sent messages to each account with her contact information requesting that he contact her.

- 4 -

No. 82918-1-I/5

Patterson also attempted to reach the mother via her Facebook account. She submitted a referral to the Department's parent locator resource in an attempt to find a way to contact the father. Finally, she contacted the hospital social worker asking if the hospital could obtain updated contact information for the parents so she could invite them to a Family Team Decision Meeting (FTDM). The hospital social worker agreed to do so and also asked to have a nurse attend the FTDM.

Patterson called the hospital later that same day to check on G.M.W.'s status. The hospital reported that it had provided a room for the parents to stay in to facilitate bonding with the child, that neither parent was present, and that the father had not visited the child that day. G.M.W., then on morphine, was being weaned from the drug. Patterson asked the hospital staff to pass her contact information on to the parents and sent the nurse an invitation to the FTDM.

The social worker then noticed that the mother had read her Facebook message so she sent a second message notifying her of the Zoom FTDM that afternoon for 4 p.m. The hospital social worker contacted Patterson to provide an updated phone number for the mother but also reported that neither parent had been to the hospital that day. Patterson immediately texted the mother, using this updated phone number. The mother responded, indicating that she was at a methadone clinic in Anacortes, but she promised to call Patterson back when done. She did not do so. Patterson also sent invitations to the FTDM to both parents via text and Facebook. Throughout the day, Patterson collaborated with Keegahn via email and telephone in an attempt to locate the parents and determine how to proceed.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 82918-1-I/6

The Department conducted the FTDM via Zoom on the afternoon of January 11 as scheduled. The purpose of the meeting was to discuss safety concerns regarding the child's birth and his medical condition. Neither parent logged in for the meeting. Patterson texted the mother to ask if she needed help joining the meeting. The mother did not respond. At 6:45 p.m., the hospital notified Patterson that the mother had shown up at the hospital to visit G.M.W. but did not stay to feed the infant when asked by the nurse to do so. The mother also reportedly returned that night and assisted with a 2:30 a.m. feeding.

The following day, Keegahn notified Patterson that the Tribe's law enforcement agency reported that the father had active warrants for his arrest, was avoiding law enforcement, and was likely staying off the reservation at the home of C.A.'s mother. Patterson also learned from a hospital social worker that the father had indicated to her that he does not like to come into the nursery, does not want to care for G.M.W. because he is so tiny, and will spend time in the boarding room while C.A spends time with the infant. The hospital also informed Patterson that the parents appeared to be using the room it had set aside for them but not for the purpose of bonding with the child.

On January 13, 2021, the mother texted Patterson with a new phone number, indicating she "[had run] out of minutes" and would call when she completed her methadone appointment that morning. The following day, Patterson obtained authorization to purchase a phone card for the mother. She attempted to contact the mother throughout the day in order to load her phone with the minutes, but she could not reach her.

- 6 -

No. 82918-1-I/7

Patterson also continued to message the father via Facebook to no avail. When she contacted the hospital on January 14, she discovered that both parents had slept in the hospital room and that the mother had participated in a couple of the daytime feedings. Neither parent was present during the overnight feedings.

On January 15, 2021, the hospital transferred G.M.W. to Providence Neonatal Intensive Care Unit for a higher level of care for breathing and blood oxygenation problems. The hospital notified the mother of this transfer.

That same day, the Department filed a dependency petition and sought an order allowing it to take G.M.W. into custody. The trial court issued the pick-up order that afternoon. The Department scheduled a shelter care hearing for January 19, a case conference for February 4, and a fact-finding hearing for February 16, 2021.

The court conducted the shelter care hearing as scheduled on January 15, 2021. Department social worker Patterson and Tribe social worker Keegahn appeared, as did the court-appointed guardian ad litem, Monica Cole. The Department informed the court of the efforts Patterson had undertaken to notify the parents of the shelter care hearing, the hospital plans to discharge the infant later that week, the fragility of the infant's medical condition, and the lack of parental engagement. The Tribe did not oppose shelter care and Keegahn assured the court that she was working closely with Patterson to locate the parents. With regard to placement, Keegahn stated that the Tribe was attempting to locate the mother to determine if it was possible to put a safe parenting plan in place, and would consider other relatives as an alternative placement option. She

- 7 -

No. 82918-1-I/8

had also lined up a licensed foster home with a tribal member if the first two options could not work.

The court found that the Department provided adequate notice of the shelter care hearing to both parents as required under RCW 13.34.062. It further found that the Department had made good faith efforts to determine if G.M.W. was an "Indian child" under IWCA and WICWA, and that G.M.W. was an Indian child as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4). Keegahn notified the court that the Tribe intended to intervene.

The court further found that the Department had made reasonable efforts to prevent or eliminate the need for removal of the child from the child's home, finding that "the Department has held case planning meetings since the birth of this child and coordinated efforts with the hospital and [the Tribe] in attempting to engage the parents in services and making them aware of the resources available to them."

The court additionally found that G.M.W. had no parent available to provide care for the child and that the release of G.M.W. to the parents would present a serious threat of substantial harm to the child. It stated orally that it would not make an imminent harm finding at that time but found that the parents had not made themselves available, the child was born premature and remained in the hospital, and the Department and the Tribe were working together to try to locate the parents and get them into services.

The court indicated to the Department and the Tribe that it would order placement in licensed foster care if the parties could not agree on an appropriate

No. 82918-1-I/9

relative placement but, "[w]hen the parents surface and arrive we can have another shelter care" to address placement, if necessary.

Later that same day, Patterson drove to the home of the maternal grandmother, located on Hulbush Lane in Burlington, Washington, in an attempt to find the parents. The mother was there and Patterson physically gave her a copy of the dependency petition, a summons, and the motion and order to take G.M.W. into Department custody. Patterson told the mother about the placement options that the Tribe was exploring.

While talking with Patterson, the mother informed the social worker that the father would be there that evening and she offered to give him his copy of the dependency pleadings when he arrived. Because Patterson understood from the Tribe that this address was the most current residence address for both parents, she handed the father's summons to the mother.

The summons included the dates and times for the scheduled case conference, the date of the fact-finding hearings, and information regarding the father's legal rights, including his right to have a fact-finding hearing and his right to counsel. The summons explained that if the parents could not afford counsel, they had the right to ask the court to appoint a lawyer at public expense. It also included contact information for the Office of Assigned Counsel.

The same day, Patterson mailed two copies of the same pleadings to the father, one via first class mail, and one via certified mail, return receipt requested, to four separate addresses: the Mount Vernon address listed in the petition, the Hulbush Lane address in Burlington, a Sedro Woolley address obtained from the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 82918-1-I/10

Department of Licensing, and "general delivery" in the Burlington post office. On February 2, 2021, the Department received a return receipt from the post office with a signature that appeared to consist of the initials "RS," indicating that an "agent" had accepted the certified mail on the father's behalf at the Mount Vernon mailing address.

Providence discharged G.M.W. on January 25, 2021, after the infant was successfully weaned from morphine and completed breathing treatments. The Department and Tribe released him to licensed foster parents who are members of the Tribe.

On February 4, 2021, the Department conducted the previously scheduled case conference. Both parents called in and participated in that conference. The parents learned that the baby was still experiencing withdrawal symptoms, with tremors, shaking, sweats, and stiffness in his limbs and neck, and that he may need physical therapy. The mother reported that she had reengaged with her substance abuse treatment provider at Didgʷàlic and intended to undergo a mental health assessment there. The father stated that he too was interested in services recommended by the Department. The services included a substance abuse evaluation and treatment, a mental health assessment, and age-appropriate parenting instruction. While the father initially resisted the recommendation that he undergo a mental health assessment, he ultimately did not argue with that recommendation once the Department explained its purpose.

During this conference, the father told Patterson that the best way to contact him was through the mother, who agreed that her phone number could be used

- 10 -

No. 82918-1-I/11

for that purpose. Patterson explained to the parents that they had a right to an attorney and how to access one. At the conclusion of the case conference, the Department put in a service referral to obtain phone service for the father.

On February 16, 2021, the court held a dependency fact-finding hearing. The parents did not appear for this hearing. Present at the hearing were Department social worker Patterson, tribal representative Keegahn, and the guardian ad litem Cole. Noting the parents' absence, the Department requested an order of default. Keegahn informed the court that the tribe did not oppose the motion for default and said, "I'll just add that I called and texted the phone number for the parents today, and they haven't responded."

Patterson testified she had made multiple attempts to contact the father through different Facebook accounts and had called and texted him, using contact information provided by the Department's parent locator program and the hospital. She indicated she tried to meet with him in person and succeeded in talking with him at the February 4 case conference. She sent service letters to every possible address she had found for the parents. Patterson informed the court that she had explained to the father that he had the right to an attorney and provided him information on how to access counsel.

Finally, Patterson verified that the allegations in the dependency petition were true and accurate. She identified the parents' deficiencies as active substance abuse, mental health, and a need for age-appropriate parenting instruction. She testified that G.M.W. needed specialized care because of the effects of being exposed to drugs while in utero and that it was not safe to return

- 11 -

No. 82918-1-I/12

him to the parents' care while they both were actively using substances. With regard to the father, Patterson had documentation showing that he had visited the baby only twice while in the hospital and no evidence he had ever provided care to the infant. The Department contracted with a visitation supervisor but this supervisor was also unable to reach either parent to set up a time to visit with G.M.W. To Patterson's knowledge, neither parent had seen G.M.W. since he was discharged from the hospital on January 25.

The court found a sufficient factual basis to find G.M.W. dependent. The Department indicated it would offer the testimony of its qualified ICWA expert witness, Keegahn, on the date of the disposition hearing. Keegahn agreed to this procedure. The court entered an order of default against both parents, and a default order of dependency. The court found that

> [t]he facts contained within the dependency petition are established by a preponderance of the evidence. Specifically, the parents both suffer from serious addiction to controlled substances and this prevents them from safely parenting this child, who is a vulnerable infant and has special medical needs related to exposure to controlled substances while in utero. Additionally, there is a sufficient factual and legal basis to support the service plan enclosed in this order.

Based on these findings, it found that G.M.W. "has no parent, guardian or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." The court concluded that dependency had thus been established under RCW 13.34.030(c).

Because ICWA and WICWA applied, the court found that the Department had made active efforts to prevent the breakup of the Indian family:

- 12 -

No. 82918-1-I/13

> [The Department] made active efforts by actively working with the parent, parents, or Indian Custodian to engage them in remedial services and rehabilitative programs to prevent the breakup of the Indian family beyond simply providing referrals to such services, but those efforts have been unsuccessful. . . . This finding is based on the following: The Department has held case planning meetings and attempted through all possible forms of communication to establish and maintain contact with the parents including arranging visitation and offering resources and services. Mother has also been offered services through the dependencies established for her older children.

The court found that the Department had offered specific services, that it had explained the need for the services during the February 4 case conference, and that it had recommended resources to them. With regard to the child's placement, the court reserved making any findings until the March 2, 2021 disposition hearing.

The parents did not appear at the disposition hearing. The Department sought a court order requiring the parents to obtain substance abuse treatment, a mental health assessment, and age-appropriate parent instruction, as laid out in Patterson's February 17 court report. The GAL and Tribe agreed with these requirements. The court then entered a disposition order consistent with this presentation. The court reserved any finding, as required by ICWA and WICWA, that continued custody of the Indian child by his mother or father would be likely to result in serious emotional or physical damage to the child.[4] Keegahn indicated her intention to submit a declaration as the qualified ICWA expert witness on this issue once she completed her review of the discovery.

---

[4] ICWA and WICWA provide that no foster care placement may be ordered without evidence from a qualified expert witness to prove by clear and convincing evidence that the continued custody of an Indian child by their parent is likely to result in serious emotional or physical damage to the child. 25 U.S.C. § 1912(e); RCW 13.38.130(2).

- 13 -

No. 82918-1-I/14

The court did find, however, that "[the Department] made active efforts by actively working with the parent, parents, or Indian Custodian to engage them in remedial services and rehabilitative programs to prevent the breakup of the Indian family beyond simply providing referrals to such services, but those efforts have been unsuccessful." The court also found that it was contrary to the child's welfare to return him home because there was no parent available to care for G.M.W. and "a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home . . . ."

Ten days later, Keegahn submitted a declaration as the qualified expert witness. She testified that G.M.W. was currently placed in a licensed home in which one of the caregivers is enrolled in the Tribe. She stated that the placement complies with the placement preferences under ICWA and WICWA because, in the absence of an ability to place the child with a parent or an appropriate relative, a licensed tribal home is the least restrictive placement possible. Keegahn opined that continued custody by either of the parents is likely to result in serious emotional or physical damage to G.M.W. because the parental deficiencies that prompted the dependency petition have not yet been mitigated. As to the father, Keegahn noted that he had rarely visited the child while G.M.W. was hospitalized and did not participate in the infant's care or feeding. Keegahn also stated that the father lacked the ability to provide safe and stable housing to the infant as he reported being homeless. Keegahn further indicated that the father had multiple active warrants for his arrest.

No. 82918-1-I/15

Keegahn opined that based on her "familiarity with this case, conversation with the assigned social worker, and other information, it is my opinion that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and these efforts have proved unsuccessful." Keegahn identified the following efforts made by the Department:

> 1) immediate contact by the CPS social worker and [Patterson] in order to consult about family history and how to best work with and support [the mother] and [the father]. 2) frequent contact with [the hospital] . . . in order to attempt to contact the parents, provide them with information, to provide updates to the parents, to arrange parent visits and to address any barriers to parental engagement. 3) the usage of the [Department] parent locator for [the father] and of Facebook for both parents in order to attempt to contact them as well as the purchase of a cell phone and minutes for [the mother]. 4) [the Department] collaborated with Upper Skagit ICW to conduct an initial relative search in order to attempt to identify relative resources for potential placement and overall family support and 5) contact was made with Didgʷàlic in order to attempt to collaborate with [the mother's] service providers with the agency.

In an April 2021 court report, Patterson informed the court that she had been in contact with the father when she located him at the maternal grandmother's home "during a collaborative effort with the [Tribe] to locate and engage the parents." At this meeting, she and Keegahn encouraged the father to contact the Office of Assigned Counsel to screen for an attorney. Patterson provided the father with a phone with minutes that the Department had "fully charged, activated, and preprogrammed [with] contact information, including [the] assigned DCYF [social] worker, Upper Skagit Indian Tribe worker, Office of Assigned Council [sic], visit supervisor at the time, GAL, and chemical dependency providers." She also sent texts with pictures of the baby for both parents to enjoy.

- 15 -

No. 82918-1-I/16

The court report also notes that Patterson notified both parents through "text, call, monthly service letter, [and] Facebook of visitation changes during this review period in addition to reminding them to contact their visit supervisor." Nevertheless, both parents struggled to make in-person visits and the visit supervisor ended the contract after the parents missed three visits. The visit supervisor subsequently set up a video visit, which the father attended on April 21, 2021.

With regard to the Department's efforts to reunify the parents with G.M.W., the Department informed the court that "[a]ttempts have been made to engage the parents in services through phone calls, texts, social media, mail, visits to known locations, monthly service letters, and Parent Locator." The Department continued to staff the case monthly with the Tribe's child protection team in an attempt to locate the parents and to engage them in services.

At a scheduled dependency review hearing on May 18, 2021, the father, who was at that point in custody, appeared without counsel. At the Department's request, the court continued the hearing to allow the father to review the April 2021 court report and to obtain counsel. Appointed counsel appeared for the father on May 21, 2021. Both the father and his attorney attended a short hearing on June 1, 2021, and again requested a continuance of the scheduled initial dependency review hearing so that counsel could consult with his client.

On June 15, 2021, the court held the initial dependency review hearing. The father's attorney appeared, but the father was not present as he had bailed out of jail. At the conclusion of the hearing, the court found that the Department

No. 82918-1-I/17

had made active efforts to prevent the breakup of the Indian family, finding that "[t]he Department staffs this case monthly at the [Tribe's] Child Protection Team meetings, while also working closely in collaboration with the [Tribe] and makes ongoing efforts to engage the parents and offer resources." It further found that placement with either parent was contrary to G.M.W.'s welfare and that the infant should remain in Department custody. It also found that the father had not participated in any services and had pending criminal charges in both superior and tribal courts.

On June 22, 2021, the father filed a motion to set aside the default order of dependency under CR 55 and 60(b)(5) based on insufficient service of process. The father raised two arguments. First, he contended it was improper under CR 4 for the Department to rely on a party, the mother, to serve the father. Second, he argued that there was no evidence the Hulbush residence was the father's "usual place of abode" as required for substitute service under RCW 4.28.080(16). At the hearing on this motion, the father made it clear he was not asking that G.M.W. be returned home and merely sought to vacate the order of default to give the father "his day in court." Keegan, the Tribe's representative, informed the court that the maternal grandmother's address on Hulbush is "the only address that tribal administration has ever had for [the father]."

The trial court found that the Hulbush address was one of the father's usual abodes. It based this finding on the fact that the residence was an address known by the Department and the Tribe, and a home where the father was found in April 2021 when he talked to the Department social worker. The court further held that

- 17 -

No. 82918-1-I/18

service on the father at that address was the most likely to ensure actual notice to the father. The court denied the motion to vacate, and signed an order to that effect on July 13, 2021.

The father appeals the July 13, 2021 order.[5]

ANALYSIS

CR 60 Motion to Vacate

The father assigns error to the trial court's refusal to vacate the default order of dependency. He contends that delivering the summons and petition to the Hulbush residence was invalid service of process. Initially, the father agreed that substitute service is acceptable under RCW 4.28.080(16). But he claimed there was insufficient evidence to establish that the Hulbush address was his usual place of abode. He argued, in the alternative, that substitute service was improper here because CR 4(c) prohibits service on the father by the mother because she is a party to this action. In supplemental briefing, the father raised a completely different argument—that the dependency service of process statute, RCW 13.34.070(8) and (9), does not permit substitute service *at all*.

We review the sufficiency of service of process de novo. *Northwick v. Long*, 192 Wn. App. 256, 260, 364 P.3d 1067 (2015). Personal service of the summons is required to establish the court's personal jurisdiction over a respondent. CR 4(d)(2); *Sutey v. T26 Corp.*, 13 Wn. App. 2d 737, 748-49, 466 P.3d 1096 (2020).

---

[5] His notice of appeal listed only the order denying the motion to vacate the default. He did not seek review of the January 2021 pick-up order or shelter care order, or any of the factual findings the court made in the February 2021 order of dependency or the March 2021 disposition order.

No. 82918-1-I/19

     1.  <u>Is substitute service permitted in dependency cases</u>?

     The father argues that substitute service under RCW 4.28.080(16) is never permissible in a dependency case because RCW 13.34.070(8) does not explicitly allow it.[6]  We disagree.

     RCW 13.34.070(8) provides:

> If a party to be served with a summons can be found within the state, <u>the summons shall be served upon the party personally</u> as soon as possible following the filing of the petition, but in no case later than fifteen court days before the fact-finding hearing, or such time as set by the court.  If the party is within the state and cannot be personally served, but the party's address is known or can with reasonable diligence be ascertained, the summons may be served upon the party by mailing a copy by certified mail as soon as possible following the filing of the petition, but in no case later than fifteen court days before the hearing, or such time as set by the court. . .

(Emphasis added.)  RCW 4.28.080(16) describes what constitutes personal service:

> Service made in the modes provided in this section is personal service.  <u>The summons shall be served by delivering a copy thereof, as follows</u>:
>
>     . . . .
>
> (16) <u>In all other cases</u>, <u>to the defendant personally</u>, or <u>by leaving a copy of the summons</u> at the house of <u>his or her usual abode</u> with some person of suitable age and discretion then resident therein.

---

[6] We note that the father did not make this argument in the trial court or in his opening brief.  Under RAP 2.5(a), a party's failure to raise an issue with the trial court generally constitutes a waiver of that argument on appeal.  *State v. Robinson*, 171 Wn.2d 292, 304, 253 P.3d 84 (2011).  We usually also will not consider arguments raised for the first time in a reply brief.  *In re Marriage of Bernard*, 165 Wn.2d 895, 908, 204 P.3d 907 (2009).  In this appeal, however, the panel specifically asked the parties to submit a supplemental brief on whether RCW 13.34.070(8) provides different service requirements than RCW 4.28.080(16).  *See* Notation Ruling, April 27, 2022.  We will therefore address this argument here.

No. 82918-1-I/20

(Emphasis added.) We conclude that RCW 13.34.070(8)'s mandate that a summons "shall be served . . . personally" means service by one of the two methods of personal service described in RCW 4.28.080(16): personal, direct hand-to-hand delivery to the parent or delivery to the parent's usual abode.

We reach this conclusion based on basic rules of statutory construction. First, we give statutory words their plain and ordinary meaning unless a different meaning is specified. *Erection Co. v. Dep't of Labor and Indus.*, 121 Wn.2d 513, 518, 852 P.2d 288 (1993). Here, the legislature said in RCW 13.34.070(8) that the summons in a dependency proceeding "shall be served . . . personally." We must assign familiar legal terms in a statute their familiar legal meaning. *Floeting v. Group Health Cooperative*, 200 Wn. App. 758, 764, 403 P.3d 559 (2017). To "serve" means to "make legal delivery of (a notice or process)." BLACK'S LAW DICTIONARY 1643 (11th ed. 2019). The noun "service," in turn means "the formal delivery of a writ, summons, or other legal process, pleading, or notice to a litigant or other party interested in litigation; the legal communication of a judicial process." *Id.* The phrase "shall be served personally" has a clear and familiar legal meaning—it means using one of the legally permitted and formal methods of delivering a summons to a litigant.

Second, each provision of a statute must be read together with related provisions to determine the legislative intent underlying the entire statutory scheme. *In re Estate of Kerr*, 134 Wn.2d 328, 343, 949 P.2d 810 (1998). "Reading the provisions as a unified whole maintains the integrity of the respective statutes." *Id.* Under our dependency statute, the Department has to act, often quickly, to

- 20 -

No. 82918-1-I/21

protect the health and safety of children. When the Department takes a child into protective custody, it must notify the parents within 24 hours of its action and schedule a shelter care hearing within 72 hours. RCW 13.34.062. And unlike standard civil lawsuits, the dependency fact-finding hearing must occur within 75 days after the Department files the petition "unless exceptional reasons for a continuance are found." RCW 13.34.070(1). The court is required to schedule and hear these cases on an expedited basis. *Id.*

Interpreting RCW 13.34.070(8)'s service of process requirement to mandate actual hand-delivery of a summons to a parent in a dependency case would make service more difficult and time-consuming, not less, and would undermine the clearly articulated legislative goal of resolving these cases quickly.

Third, a more specific statute supersedes a general statute only if the two statutes pertain to the same subject matter and conflict to the extent they cannot be harmonized. *Estate of Kerr*, 134 Wn.2d at 343. RCW 13.34.070(8), the more specific statute, does not supersede RCW 4.28.080(16), the more general one, because the two can be easily harmonized. Under RCW 4.28.080(16), which explicitly applies to all "cases" other than those listed in RCW 4.28.080(1) through (15), the Department may serve a parent either by direct, hand-to-hand delivery or by substitute service. Both are a permissible method of serving a parent personally.

We conclude personal service through substitute service is permitted under RCW 13.34.070(8).

- 21 -

No. 82918-1-I/22

2. <u>Did the Department serve the father at his usual abode</u>?

The father next contends that the Department failed to prove that the Hulbush residence in Burlington was his "usual abode" for purposes of substitute service under RCW 4.28.080(16).

When a defendant challenges service of process, the plaintiff has the initial burden of proof to establish a prima facie case of proper service. *Northwick*, 192 Wn. App. at 261. A plaintiff establishes a prima facie case by providing a declaration from the person who served process, regular in form and substance. *Id*. The burden then shifts to the challenging party to show by clear and convincing evidence that service was improper. *In re Dependency of A.G.*, 93 Wn. App. 268, 277, 968 P.2d 424 (1998). Clear and convincing evidence exists when the ultimate facts are shown to be "highly probable." *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 478, 379 P.3d 75 (2016) (internal quotation marks omitted).

The Department provided an affidavit of service from the social worker to establish its prima facie case of proper substitute service. The father has not identified anything improper in form or substance with this affidavit of service. Thus, the burden of proof shifted to the father to prove it "highly probable" that the Hulbush residence was not "the house of his usual abode."

The term "usual place of abode" means a center of one's domestic activity such that service left with a family member is reasonably calculated to come to one's attention within the statutory period for a defendant to appear. *Northwick*, 192 Wn. App. at 262. The term is to be liberally construed to effectuate service

No. 82918-1-I/23

and uphold jurisdiction. *Sheldon v. Fettig*, 129 Wn.2d 601, 609, 919 P.2d 1209 (1996).

In this case, the record indicates three separate addresses as possible residences for the father. The petition alleged his last known home address was on Stanford Drive in Mount Vernon. In the father's motion to set aside the default, counsel informed the court that the Department of Licensing had an address for the father on Sigwigwilse Lane in Sedro Woolley, dating from 2009. But the Tribe notified the Department that it believed the father was living with the mother in the home of the maternal grandmother on Hulbush Lane in Burlington and that this address was the only one that its administrative office had for the father.

As the trial court noted, it is possible to have more than one house of abode under RCW 4.28.080(16). *Sheldon*, 129 Wn.2d at 611. Our Supreme Court has indeed accepted the notion that " '[i]n a highly mobile society it is unrealistic to interpret [the substitute service statute] as mandating service at only one location where, in fact, a defendant maintains several dwelling places.' " *Id.* (quoting *Karlin v. Avis*, 326 F. Supp. 1325, 1329 (E.D.N.Y. 1971)).

Here, the trial court found that while it was possible the father had multiple houses of usual abode, the maternal grandmother's residence was the one most likely to ensure the father received actual notice of the dependency proceedings. This finding is supported by substantial evidence. First, the father submitted no declaration testimony to identify where he actually lived or to confirm he was in fact homeless. Second, the residence was the address the Tribe identified as the father's home and the only one the Tribe provided to the Department. Third, the

No. 82918-1-I/24

mother confirmed the father could be found at that address when the social worker met her there. Finally, it was the address where the social worker later found the father and spoke to him face-to-face about the pendency of the case and the services the Department sought to arrange for him. The trial court did not err in concluding that the father failed to establish by clear and convincing evidence that the Hulbush residence was not his usual place of abode.

3. Did the Department serve the father through "second-hand service" by handing the father's summons to the mother?

The father next contends that under CR 4(c) and RCW 13.34.070(9), he was improperly served by the mother because she is a party in this dependency proceeding. The father is conflating substitute service, permitted by RCW 4.28.080(16), with second-hand service. Substitute service requires (1) leaving a copy of the summons at the house of the defendant's usual abode (2) with a person of suitable age and discretion (3) who is a resident of the same house. *Wichert v. Cardwell*, 117 Wn.2d 148, 150, 812 P.2d 858 (1991).

Service occurs upon delivery to the person of suitable age, whether or not she then actually hand delivers the summons to the defendant. *See A.G.*, 93 Wn. App. at 277 (substitute service on mother occurred when pleadings were left with and accepted by co-resident of house, even though mother's whereabouts were unknown).

Second-hand service is a different concept. In *Scanlan v. Townsend*, 181 Wn.2d 838, 854-56, 336 P.3d 1155 (2014), the Supreme Court held that personal service can be accomplished by multiple people. In that case, a process server, attempting to serve Townsend, delivered the summons to her father at the father's

- 24 -

No. 82918-1-I/25

home. Townsend, however, no longer resided there. The father, who was not named in the lawsuit, then delivered the summons to Townsend. 181 Wn.2d at 840-41. The court held that the father had served Townsend. "[D]irect, hand-to-hand—but 'secondhand'—service" may be sufficient so long as the service is made by an allowable person. *Scanlan*, 181 Wn.2d at 848.

The court said that even if substitute service could not occur at the father's address, the plaintiff had personally served Townsend through the father. 181 Wn.2d at 848. But, it noted, Scanlan was not relying on substitute service but was instead arguing that the father accomplished personal service by handing the summons to his daughter. *Id.* The court concluded that the father could, even unwittingly, serve process on his daughter through second-hand delivery because he was not a party to the lawsuit. *Id.* at 853.

In this case, the Department did not rely on second-hand service. It relied, instead, on substitute service. RCW 4.28.080(16) merely requires that the person *accepting* the summons be a resident of the home.[7] It does not state that the recipient cannot be a party to the same lawsuit. While RCW 13.34.070(9) and CR 4(c) restrict who may perform the act of *delivering* the summons, neither the statute nor court rule address who may perform the act of *accepting* the summons on another resident's behalf.

---

[7] The father did not challenge the mother's status as a "resident" in the home where service occurred. *See Wichert v. Cardwell*, 117 Wn.2d 148, 150, 812 P.2d 858 (1991) (adult daughter who stayed the night at her mother's home but did not live there could accept service on behalf of her mother and stepfather); *c.f. Salts v. Estes*, 133 Wn.2d 160, 162, 943 P.2d 275 (1997)("[A] person who was a fleeting presence in the defendant's home was not 'resident' therein for purposes" of accepting service).

No. 82918-1-I/26

Because the Department did not serve the father through second-hand service, the trial court did not err in concluding that the Department properly served the father by delivering it to the mother at their house of usual abode.

<u>ICWA and WICWA—Appointment of Counsel</u>

The father next argues that the trial court violated his right to counsel under 25 U.S.C. § 1912(b) and RCW 13.38.110 by not appointing an attorney to represent him at the commencement of the dependency. Although the father did not raise this argument below, we nevertheless conclude the trial court had no obligation to appoint counsel to represent the father until he appeared, requested an attorney, and established indigency.

25 U.S.C. § 1912(b) provides:

> In any case in which the court determines indigency, the parent or Indian custodian shall have the right to court-appointed counsel in any removal, placement, or termination proceeding. The court may, in its discretion, appoint counsel for the child upon a finding that such appointment is in the best interest of the child.

RCW 13.38.110 is almost identical:

> In any child custody proceeding under this chapter in which the court determines the Indian child's parent or Indian custodian is indigent, the parent or Indian custodian shall have the right to court-appointed counsel. The court may, in its discretion, appoint counsel for the Indian child upon a finding that the appointment is in the best interests of the Indian child. [8]

---

[8] RCW 13.34.090(2) provides that any parent in a dependency proceeding has the right to have counsel appointed at public expense when: (a) the parent has appeared or requested appointment of counsel, and (b) the parent is financially unable to obtain counsel because of indigency. Thus, in non-ICWA and non-WICWA cases, the statutory right to counsel is not triggered until a parent appears and demonstrates indigency. Our court rules follow RCW 13.34.090(2). JuCR 9.2(c)(2) provides that in dependency and termination proceedings, "[u]pon request of the parent or parents, the court shall appoint a lawyer for a parent who is unable to obtain a lawyer without causing substantial hardship to himself or herself or the juvenile's family. The ability to pay part of the cost of a lawyer shall not preclude assignment."

No. 82918-1-I/27

The father acknowledges that no court in Washington has concluded that either statutory provision requires the automatic appointment of counsel to a parent of an Indian child when the parent has neither demonstrated his indigency nor requested legal representation.

Statutory interpretation of ICWA and WICWA is a question of law we review de novo. *In re Dependency of Z.J.G.*, 196 Wn.2d 152, 163, 471 P.3d 853 (2020). The purpose of our inquiry is to determine legislative intent and interpret the statutory provisions in a way that carries out that intent. *Id.* If the plain language is subject to only one interpretation, our inquiry ends. *Id.* Plain meaning is derived from the context of the entire statute as well as any related statutes which disclose legislative intent about the provision in question. *Id.* ICWA and WICWA are interpreted coextensively, barring specific differences in their statutory language. *Id.*

We conclude that the statutory right to appointed counsel in an ICWA or WICWA dependency proceeding does not attach until the parent appears in the proceeding, seeks the appointment of counsel, and establishes indigency. First, the plain language of 25 U.S.C. § 1912(b) and RCW 13.38.110 both condition the appointment of counsel on a court finding that a parent is indigent.[9] *See State ex rel. Juvenile Dept. of Multnomah County v. Charles*, 70 Or. App. 10, 688 P.2d 1354,

---

[9] ICWA regulations require the court to ensure that notice of the dependency proceeding is sent to each Tribe where the Indian child may be a member and to the child's parents. 25 C.F.R. § 23.111(b). This notice must inform the parents that "if the child's parent or Indian custodian is unable to afford counsel based on a determination of indigency by the court, the parent or Indian custodian has the right to court-appointed counsel." 25 C.F.R. § 23.111(d)(6)(iv). If a parent or Indian custodian of an Indian child appears in court without an attorney, "the court must inform him or her of his or her rights, including any applicable right to appointed counsel …." 25 C.F.R.§ 23.111(g).

- 27 -

No. 82918-1-I/28

1358 (1984) (trial court complied with ICWA by appointing counsel to the Indian child's parents on the day they filed their affidavit of indigency with the court).

Second, other statutes addressing the appointment of counsel indicate the party seeking such services at public expense must come forward to demonstrate indigency. Although neither ICWA nor WICWA defines the term "indigent" or "indigency," or addresses when or how this factual determination is made, RCW 10.101.010(3), the statute governing indigent defense services, and the dependency statute itself, RCW 13.34.030(16), both define "indigent" identically to mean:

a person who, at any stage of a court proceeding, is:

(a) Receiving one of the following types of public assistance: Temporary assistance for needy families, aged, blind, or disabled assistance benefits, medical care services under RCW 74.09.035, pregnant women assistance benefits, poverty-related veterans' benefits, food stamps or food stamp benefits transferred electronically, refugee resettlement benefits, medicaid, or supplemental security income; or
(b) Involuntarily committed to a public mental health facility; or
(c) Receiving an annual income, after taxes, of one hundred twenty-five percent or less of the federally established poverty level; or
(d) Unable to pay the anticipated cost of counsel for the matter before the court because his or her available funds are insufficient to pay any amount for the retention of counsel.

RCW 10.101.020(3) provides that "[t]he determination of indigency shall be made upon the defendant's initial contact with the court or at the earliest time circumstances permit." Any person receiving the appointment of counsel "shall also sign an affidavit swearing under penalty of perjury that all income and assets reported are complete and accurate. In addition, the person must swear in the affidavit to immediately report any change in financial status to the court." RCW

- 28 -

No. 82918-1-I/29

10.101.020(5). The office charged by the court to make the determination of indigency must maintain a written record of the information obtained from the defendant that provides the basis for eligibility. RCW 10.101.020(6). These provisions strongly suggest that the trial court cannot find a parent indigent without a factual basis for doing so and the source of information about the parents' ability to pay must come from the parents themselves.

Third, while RCW 10.101.020(4) permits a court to appoint an attorney on a provisional basis if the court cannot determine the parent's eligibility before the first legal services are rendered, in this case, there was no client from whom an attorney could have taken instruction. No attorney could ethically or effectively represent a client when they have no reachable client to consult and do not know the client's position on the relevant issues. *In re Dependency of E.P.,* 136 Wn. App. 401, 406, 149 P.3d 440 (2006); *A.G.,* 93 Wn. App. at 278. RPC 1.2(a) provides that "a lawyer shall abide by a client's decisions concerning the objectives of representation and . . . shall consult with the client as to the means by which they are to be pursued." Had the trial court appointed an attorney to represent the father's interests here, that attorney would not have known if the father wanted to waive any purported defects in personal service, to contest shelter care, to challenge the infant's status as dependent, to have any say in placement, or to visit the infant.[10]

---

[10] None of the out-of-state cases on which the father relies are sufficiently legally or factually analogous. *See In re Matter of J.W.*, 742 P.2d 1171 (Okla. Civ. App. 1987) (mother found indigent and appointed counsel in dependency proceeding had right under 25 U.S.C. § 1912(b) to appointed attorney after entry of dispositional order and before termination petition filed; mother could not knowingly or intelligently waive right to counsel before being advised of right to attorney); *In re Matter of I.T.S.*, 490 P.3d 127, 134 (Okla.

No. 82918-1-I/30

Because the father did not appear until after the court had entered the default dependency order and there was no opportunity for the court to make an indigency determination or for counsel to consult as to the father's wishes until that time, the trial court did not violate ICWA or WICWA in failing to sua sponte appoint counsel to represent the father at the commencement of the dependency.

WICWA—Active Efforts

Finally, the father contends that "at no point did the court find the Department exerted 'active efforts' to prevent the breakup of [the father's] native family." This argument is not supported by the trial court's default orders, in which explicit active efforts findings were made.

Both ICWA and WICWA require the Department to make "active efforts" to prevent the breakup of the Indian family. 25 U.S.C. § 1912(d); RCW 13.38.130(1). Trial courts presiding over hearings involving children protected by WICWA are required to evaluate whether active efforts have been taken "at every hearing when the Indian child is placed out of the home." *In re Dependency of G.J.A.*, 197 Wn.2d 868, 875, 459 P.3d 631 (2021) (quoting RCW 13.38.040(1)(a)(ii)).

The father argues that the trial court failed to make any "active efforts" findings at any hearing, including the shelter care hearing. The father, however, did not challenge shelter care below and did not seek to have G.M.W. returned

2021) (parent of Indian child who had court-appointed attorney through dependency proceeding had right to uninterrupted court-appointed counsel upon a finding parent was indigent); *Matter of Bluebird*, 411 S.E. 2d 820, 824-25 (N.C. App. 1992) (due process not violated where mother found not indigent at time of dependency but deemed indigent at time of termination proceeding, where termination based in part on finding of neglect from dependency proceeding); *Matter of M.E.M.*, 635 P.2d 1313, 1316-17 (Mont. 1981) (trial court violated 25 U.S.C. § 1912(b) by not appointing counsel to undisputedly indigent, developmentally disabled mother, even though she did not specifically request one).

No. 82918-1-I/31

home. ("Again, . . . I'm not asking for return home of the children.") Additionally, the father did not list the shelter care order in his notice of appeal or assign error to the shelter care order itself. The shelter care order is thus not properly before us.[11]

With regard to the subsequent orders, the trial court did make explicit active efforts findings. In its February 2021 dependency order, the trial court found:

> [The Department] made active efforts by actively working with the parent, parents, or Indian Custodian to engage them in remedial services and rehabilitative programs to prevent the breakup of the Indian family beyond simply providing referrals to such services, but those efforts have been unsuccessful. . . . This finding is based on the following: The Department has held case planning meetings and attempted through all possible forms of communication to establish and maintain contact with the parents including arranging visitation and offering resources and services. Mother has also been offered services through the dependencies established for her older children.

In its March 2, 2021 dispositional order, the court found that "[the Department] made active efforts by actively working with the parent, parents, or Indian Custodian to engage them in remedial services and rehabilitative programs to

---

[11] At the time of that hearing in January 2021, the trial court followed existing precedent, *In re the Dependency of Z.J.G.*, 10 Wn. App. 2d 446, 450, 448 P.3d 175 (2019), *reversed on other grounds*, 196 Wn.2d 152, 471 P.3d 853 (2020), which held that the "active efforts" requirement did not apply at an imminent harm 72-hour shelter care hearing. The Washington Supreme Court recently overruled *Z.J.G.* and held that under WICWA, "[t]he department [is] presumptively obligated to establish it had provided active efforts to [the child's] family before removing him from his home and initiating a dependency," before shelter care, unless an emergency arises requiring the removal of a child to prevent imminent physical harm to that child. *In re Dependency of J.M.W.*, __ Wn.2d __, 514 P.3d 186, 193 (2022). It also held that even if the duty is not triggered at an initial shelter care hearing, when the Department has had prior contact with a family and has reason to believe the child is at risk of physical harm, it has an obligation to "at least begin active efforts to avoid breaking up the family" and the trial court must consider whether active efforts have been taken at any subsequent hearings. *Id.*

No. 82918-1-I/32

prevent the breakup of the Indian family beyond simply providing referrals to such services, but those efforts have been unsuccessful."

And again, at the June 15, 2021 first dependency review hearing, the trial court found that the Department had met its active efforts obligation. The court found that "[t]he Department staffs this case monthly at the Upper Skagit Indian Tribe Child Protection Team meetings, while also working closely in collaboration with the Upper Skagit Indian Tribe and makes ongoing efforts to engage the parents and offer resources." The father has not challenged these findings on appeal.

Whether the Department satisfied the active efforts requirement is a mixed question of law and fact. *In re G.J.A.*, 197 Wn.2d at 887. We review the trial court's findings of fact for substantial evidence and review the legal question of whether the Department made active efforts in compliance with ICWA and WICWA de novo. *Id.*

There is substantial evidence in the record to support the trial court's active efforts findings here. Department social worker Faber went to the hospital to meet with the parents as soon as the Department learned of G.M.W.'s birth and exposure to drugs in utero. She immediately engaged the Tribe's social worker to learn about the family's background, to locate the parents, to engage them in services, and to discuss the medical needs of their newborn. She conducted a FTDM within days of G.M.W.'s birth to try to plan for the child's safe return home, but the parents did not participate in this planning session. It does not appear that either the Department or the Tribe considered the father as a placement possibility,

No. 82918-1-I/33

and for good reason: he had pending felony charges and several outstanding arrest warrants, and he had indicated he did not want to care for the infant.

Department social worker Patterson testified that she conducted a case conference with both parents to establish a working relationship with them and to help them obtain substance abuse treatment, a mental health assessment, and parenting instruction. She made multiple attempts to engage both parents in services, via text, e-mail, Facebook, and telephone. But neither parent was attending to G.M.W.'s special needs, and the hospital sought a plan for G.M.W.'s discharge.

The Department engaged the Tribe in every decision made regarding G.M.W.'s placement after discharge. Both Patterson and the Tribe investigated the possibility of placing the baby with the mother while she obtained inpatient treatment, or placing him with relatives, and if neither could occur, then with a foster home managed by a tribal member.

Patterson also testified about setting up an in-person visitation supervisor and a video visitation service provider to make sure the parents had the opportunity to develop a relationship with their newborn infant. Finally, the Department's court reports document how it staffed this child's case on a monthly basis with the Tribe's child protection team in an attempt to locate the parents and to engage them in services.

The Tribe's social worker supported these efforts, submitting a declaration in which she laid out everything the Department had done to prevent the breakup of this Indian family, including its extensive consultation with the Tribe to learn

- 33 -

No. 82918-1-I/34

about the family's history, to attempt to contact the parents and provide information to them, to arrange parent visits, to eliminate barriers to parental engagement, to conduct a relative search to find relative resources for potential placement and family support, and to attempt to connect and collaborate with the mother's treatment providers.[12]

The father argues that he lacked a telephone and that the Department should have assisted him in obtaining one. But in fact, the social worker's court report documented that immediately after the February 4 case conference, at which the Department learned that the father lacked his own telephone, the social worker made a service referral to obtain phone service for the father. In an April 2021 entry in this report, Patterson stated that when she met with the father at the maternal grandmother's home that month, she "gave [the father] a phone with minutes that the Department had fully charged, activated, and preprogrammed [with] contact information including assigned DCYF worker, Upper Skagit Indian Tribe worker, Office of Assigned Council [sic], visit supervisor at the time, GAL, and chemical dependency providers."

The father also argues the Department did not assist him in finding housing. But the father did not make this argument below. In fact, neither he nor his attorney contested the Tribe's testimony that the Department was engaged in trying to eliminate whatever barriers this father had to reunification with G.M.W.

---

[12] The father does not argue that the Keegahn declaration, filed with the court after the two orders were entered, cannot be considered when evaluating the sufficiency of the evidence to support the trial court's active efforts findings. Moreover, neither ICWA nor WICWA require expert testimony on the issue of active efforts. The trial court could base its finding on the social worker's testimony and court reports.

- 34 -

No. 82918-1-I/35

Because the trial court made active effort findings at the dependency hearing, the disposition hearing, and the first dependency review hearing, the trial court complied with its duty to consider this issue as required by ICWA and WICWA.

We therefore affirm.

_Andrus, C.J._

CONCUR:

_Mann, J._

No. 82918-1-I/1

COBURN, J. (dissenting) — I respectfully dissent for three reasons. First, the Department did not personally serve the father as mandated by RCW 13.34.070(8) despite knowing his probable location three days prior to filing the dependency petition. Second, the Department relied on the mother, another party in the proceedings, to provide service to the father in violation of RCW 13.34.070(9). Third, the Department, in violation of WICWA and ICWA, failed to provide active efforts prior to entering a default order of dependency.

<u>Proper Service</u>

The personal service statutes that are in tension with each other are in different titles enacted decades apart with no reference to each other. <u>See</u> <u>Hardel Mut. Plywood Corp. v. Lewis County</u>, __ Wn.2d __, 515 P.3d 973 (2022) (applying statutory interpretation to specific and general venue statutes in different titles, adopted at different times without reference to each other).

It is well established that RCW 4.28.080, under Title 4 RCW addressing civil procedure, provides for different modes of personal service. The statute explicitly provides that "[s]ervice made in the modes provided in this section is personal service." RCW 4.28.080. After listing numerous requirements of how service must be delivered in a variety of circumstances not relevant here, subsection 16 in the statute provides that the summons shall be served "[i]n all other cases, to the defendant *personally*, or by leaving a copy of the summons at the house of his or her usual abode with some person of suitable age and discretion then resident therein." RCW 4.28.080(16) (emphasis added). This language was adopted by the legislature in 1893. Laws of 1893, ch. 127, § 7. This is a general statute applicable to standard civil cases.

1

Eighty-four years later, the legislature adopted statutes related to dependency of a child and the termination of a parent and child relationship. RCW 13.34.010. In 1977, the legislature passed the Juvenile Court Act and adopted provisions now codified in RCW 13.34.070 that provide personal service procedures specifically in cases that relate to dependency and termination proceedings.[1] Laws of 1977, 1st Ex. Sess., ch. 291 § 35.

Thus, the legislature established the following mandatory procedures to effectuate service when the case involves dependency:

> If a party to be served with a summons can be found within the state, the summons *shall be served upon the party personally* as soon as possible following the filing of the petition, but in no case later than fifteen court days before the fact-finding hearing, or such time as set by the court. *If the party is within the state and cannot be personally served*, but the party's address is known or can with reasonable diligence be ascertained, *the summons may be served upon the party by mailing a copy by certified mail as soon as possible following the filing of the petition*, but in no case later than fifteen court days before the hearing, or such time as set by the court. If a party other than the child is without the state but can be found or the address is known, or can with reasonable diligence be ascertained, service of the summons may be made either by delivering a copy to the party personally or by mailing a copy thereof to the party by certified mail at least ten court days before the fact-finding hearing, or such time as set by the court.

RCW 13.34.070(8) (emphasis added).

*A. Serving Personally*

The majority reads the term "personally" in RCW 13.34.070(8) to mean "personal" service that can be satisfied by serving a parent either personally, by hand-to-hand delivery, or substitute service at the parent's usual abode as provided in RCW 4.28.080(16). This ignores the plain language of the statutes.

---

[1] Former RCW 4.28.080(15) is the same language now codified under subsection 16. LAWS OF 1997, ch. 380, § 1.

2

No. 82918-1-I/3

"Within our statutory interpretation process, we first consider the statute's plain language." Matter of Adoption of T.A.W., 186 Wn.2d 828, 840, 383 P.3d 492 (2016) (citing State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007)). "'If the plain language is subject to only one interpretation, our inquiry ends because plain language does not require construction.'" Id. (quoting HomeStreet, Inc. v. Dep't of Revenue, 166 Wn.2d 444, 451, 210 P.3d 297 (2009)). "If the statutory language is both plain and unambiguous, the meaning we give the statute must be derived from the statutory language itself." Id. "To ascertain the statute's plain meaning, we may examine (1) the entirety of the statute in which the disputed provision is found, (2) related statutes, or (3) other provisions within the same act." Id. (citing Dept. of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 10, 43 P.3d 4 (2002)).

The term "personally" is not defined in either statutory scheme. However, as the majority observes, it is well established that to serve "personally" means hand-to-hand delivery. Majority at 25; See Scanlan v. Townsend, 181 Wn.2d 838, 854-56, 336 P.3d 1155 (2014) (recognizing second-hand service sufficient to satisfy serving "personally" under RCW 4.28.080(16) when father personally delivered summons to daughter). "'[I]t is a fundamental rule of statutory construction that once a statute has been construed by the highest court of the state, that construction operates as if it were originally written into it.'" State v. Roggenkamp, 153 Wn.2d 614, 629, 106 P.3d 196 (2005) (quoting Johnson v. Morris, 87 Wn.2d 922, 927, 557 P.2d 1299 (1976)).

Furthermore, this is consistent with the principle of noscitur a sociis, which provides that a single word in a statute should not be read in isolation, and that the meaning of words may be indicated or controlled by those with which they are

3

associated. Roggenkamp, 153 Wn.2d at 623. All the different forms of service listed in RCW 4.28.080 are, by its own language, "modes" of "personal service." Thus, serving "personally" is one mode of personal service.

Also, "when amending a statute, the legislature is presumed to know how the courts have construed and applied the statute." Roggenkamp, 153 Wn.2d at 629 (citing In re Pers. Restraint of Quackenbush, 142 Wn.2d 928, 936, 16 P.3d 638 (2001)). Although RCW 13.34.070(8) was not an amendment of RCW 4.28.080, both statutes address personal service, and the legislature was aware that for 84 years, under RCW 4.28.080(16), the term "personally" meant hand-to-hand delivery at the time it adopted RCW 13.34.070(8). The legislature could have simply referenced RCW 4.28.080(16) if it wished to allow for the same form of service, which expressly allowed for substitute service at the party's usual abode, or it could have expressly allowed for substitute service in RCW 13.34.070(8). It did neither. Instead, the legislature elected to expressly require parents to be served "personally" within the parameters of RCW 13.34.070(8).

When interpreting a statute, "'this court is required to assume the Legislature meant exactly what it said and apply the statute as written.'" Roggenkamp, 153 Wn.2d at 625 (internal quotation marks omitted) (quoting In re Recall of Pearsall-Stipek, 141 Wn.2d 756, 767, 10 P.3d 1034 (2000)).

The majority turns to the expediency of the need to protect the health and safety of children and the court's requirement to schedule timely hearings as a reason why the legislature must not have meant mandating hand-delivery of a summons. Majority at 21. The majority concludes that doing so "would make service more difficult and time-

4

consuming" and "undermine the clearly articulated legislative goal of resolving these cases quickly." The majority ignores the parameters built into the statute that allows the Department to act quickly while also recognizing that dependency proceedings are different than civil disputes over money or property.

"A parent's right to the care, custody, and control of his child 'is perhaps the oldest of the fundamental liberty interests recognized.'" T.A.W., 186 Wn.2d at 841 (quoting Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion)); see also In re Welfare of Sumey, 94 Wn.2d 757, 762, 621 P.2d 108 (1980). The Washington Supreme Court has repeatedly recognized that "'courts undertake a grave responsibility when they deprive parents of the care, custody and control of their natural children.'" T.A.W., 186 Wn.2d at 840-41 (internal quotation marks omitted) (quoting In re Pawling, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)). Moreover, "in assessing the constitutionality of a procedure which infringes upon parents' rights to the care, custody, and companionship of their children, it is necessary to ascertain the proper balance between the parents' constitutional rights and the State's constitutionally protected parens patriae interest in protecting the best interests of the child." Sumey, 94 Wn.2d at 762-63.

The legislature did just that in RCW 13.34.070(8) by requiring the Department to personally serve a parent when the parent "can be found within the state," but allowing for service upon the parent "by mailing a copy by certified mail as soon as possible following the filing of the petition, but in no case later than fifteen court days before the hearing, or such time as set by the court" when the parent "cannot be personally served." When the parent or guardian is a nonresident or the person's place of

residence, or whereabouts is unknown, the Department may deposit a copy of the notice in the post office, postage prepaid, directed to such persons at their last known place of residence if the Department, "[a]fter due diligence," has attempted service of the summons or notice provided for in RCW 13.34.070 but has been unsuccessful. RCW 13.34.080(1)(b). In such a scenario, "the court shall direct the clerk to publish notice in a legal newspaper," but the publication "may proceed simultaneously with efforts to provide service in person or by mail, when the court determines there is reason to believe that service in person or by mail will not be successful." RCW 13.34.080(1), (2).

Thus, the legislature allowed for non-burdensome timely alternative service when the Department is unable to personally serve the parent so that mandating personal service would not frustrate the goal of resolving these types of cases quickly.

Additionally, the majority cites to A.G. to support its assertion that "[s]ervice occurs upon delivery to the person of suitable age, whether or not she then actually hand delivers the summons to the defendant." Majority at 24 (citing In re Dependency of A.G., 93 Wn. App. 268, 277, 968 P.2d 424 (1998) (applying former RCW 4.28.080(15) (1997). However, the A.G. court did not analyze RCW 13.34.070.

In A.G., the mother, whose parental rights were being terminated, claimed she was not personally served. A.G., 93 Wn. App. at 274. The mother could not be located, so the Department gave notice by publication. Id. The Department also served her by leaving a copy of the notice and summons at her last known address. Id. Return of service noted that a co-resident of the house accepted the documents at that address. Id.

The A.G. court found service was proper under former RCW 4.28.080(15) and RCW 13.34.080. A.G., 93 Wn. App. at 277-78. RCW 13.34.080 allows for notice by publication simultaneously with efforts to provide service in person or by mail when the court determines there is reason to believe that service in person or by mail will not be successful. RCW 13.34.080(2). The A.G. court noted that the mother did not dispute that she was served properly by publication. A.G., 93 Wn. App. at 278. The A.G. court made no mention of RCW 13.34.070. Thus, A.G. is not instructive in this analysis.

In the instant case, three days before filing the petition, the Department learned that tribal law enforcement believed that the father might be staying off the reservation at C.A.'s mother's home. The petition was filed on January 15, 2021. The first time the Department attempted to reach the father at C.A.'s mother's home on Hulbush Lane in Burlington, Washington, was *after* the shelter care hearing on January 19. Patterson, the Department's social worker, arrived at the home and spoke with C.A. who said she would be seeing the father that evening and would give him his copy of the documents. The Department hand delivered the documents to C.A. and depended on her, the mother and party in the proceedings, to deliver the father's documents to him instead of returning to the home that evening or another day. The Department confirmed at oral argument that this was the only time the Department physically attempted to serve the father at Hulbush Lane. Wash. Court of Appeals oral argument, In re the Dependency of G.M.W., No. 82918-1-I (July 26, 2022), at 9 min., 55 sec. through 10 min., 01 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?clientID=9375922947&eventID=2022071065. Both the mother and father did not appear at the fact-finding hearing on February 16.

7

The Department did not comply with RCW 13.34.070(8). The father could be found within the state and the Department did not serve the father personally as soon as possible following the filing of the petition and made no attempts to serve the father personally no later than 15 court dates before the fact-finding hearing.

The majority contends that because "personally" in RCW 13.34.070(8) means "personal" service as articulated in RCW 4.28.080(16), the Department effectuated service to the father through substitute service by leaving the documents with C.A. at the usual abode of the father. Majority at 26. However, as discussed, the legislature did not elect to allow for such substitute service in dependency cases.

*B. Service by Party Prohibited*

The legislature also elected to go further than Civil Rule 4(c) by statutorily limiting who can serve a party. CR 4(c) provides that service of summons and process shall be performed by any person over 18 years of age who is competent to be a witness in the action other than a party. CR 4(c). RCW 13.34.070 provides:

> Service of summons may be made under the direction of the court by any person eighteen years of age or older *who is not a party to the proceedings* or by any law enforcement officer, probation counselor, or department employee.

RCW 13.34.070(9) (emphasis added).

Considering that dependency proceedings often deal with allegations of dysfunctional or challenging home settings, and the proposed action involves interfering with fundamental parental rights, requiring the Department to at least attempt to serve the party personally and not just leave the critical summons and petition with someone at the abode comports with public policy. In the instant case, C.A. was a party to the proceeding. The Department was aware that she had a lengthy history of heroin that

8

affected her ability to parent, that she had pending dependency proceedings involving two of her three children, and that the Department had attempted to engage her in drug treatment and mental health treatment since at least 2016. Because G.M.W.'s umbilical cord tested positive for both amphetamines and heroin, it suggested C.A. was currently using drugs. It is understandable why the legislature would not allow the Department to depend on a party in a dependency proceeding to serve another party.

The majority does not dispute that RCW 13.34.070(9) prohibits a party from serving another party and that C.A. is a party in this proceeding. Nevertheless, the majority holds that RCW 13.34.070(9) was not violated because C.A. was not the server and merely accepted service under the substitute service provision under RCW 4.28.080(16).[2] Majority at 25-26. Under this logic, the Department could not have given the father's summons and notice to C.A. a block away from the home at Hulbush Lane, but could do so at the home. It is doubtful the legislature adopted RCW 13.34.070(9) with the intent to allow for such an absurd scenario.

Further, the Department cannot assume that the mother and father are equally motivated or share the same defenses. In re Dependency of K.N.J., 151 Wn. App. 306, 311, 211 P.3d 483 (2009) (recognizing that in dependency proceedings, "[e]ach parent is entitled to mount a separate defense against that allegation; one cannot necessarily speak for the other").

The Department violated RCW 13.34.070(9) by depending on the mother, a party to the proceedings, to serve the father.

---

[2] Though not argued by the father, even under the substitute service alternative in RCW 4.28.080(16) it is questionable whether C.A. would meet the requirement that she is someone of suitable discretion who is a resident therein as required.

No. 82918-1-I/10

When there are apparent conflicts between statutes, courts generally resolve such conflicts by "giving 'preference to the more specific and more recently enacted statute.'" Lenander v. Washington State Dep't of Ret. Sys., 186 Wn.2d 393, 412, 377 P.3d 199 (2016) (internal quotation marks omitted) (quoting Gorman v. Garlock, Inc., 155 Wn.2d 198, 210, 118 P.3d 311 (2005))). When both a general and specific statute potentially apply, we give effect to the specific statute unless there is some indication the legislature intended the general to govern. Hardel Mut. Plywood Corp., 515 P.3d at 976.

RCW 13.34.070 is the more recently enacted statute. RCW 13.34.070(8) and (9) are more specific than RCW 4.28.080(16). Nothing indicates that the legislature intended the general standard civil procedure personal service statute to govern in dependency proceedings when the legislature expressly adopted a personal service statute specifically for dependency proceedings.

"[A] judgment entered without valid service is void and may be vacated when the want of jurisdiction is established by evidence." Rodriguez v. James-Jackson, 127 Wn. App. 139, 146, 111 P.3d 271 (2005). I respectfully disagree with the majority and would conclude that because the Department failed to validly serve the father, the court lacked jurisdiction over him. Accordingly, I would reverse the trial court's denial of the motion to vacate the default and dependency orders and remand for further proceedings, observing that the father did not appeal the shelter care order.

10

No. 82918-1-I/11

*C. Active Efforts*

The majority also concludes that the Department made adequate "active efforts" under ICWA and WICWA to prevent the breakup of the Indian family. 25 U.S.C. § 1912(d); RCW 13.38.130(1). I disagree.

On appeal, the issue of whether the Department has satisfied the "active efforts" requirement is a mixed question of law and fact. In re Dependency of A.L.K., 196 Wn.2d 686, 697, 478 P.3d 63 (2020). "This court reviews the trial court's findings of fact for substantial evidence, but it reviews the legal question of whether the Department made active efforts in compliance with ICWA and WICWA de novo." G.J.A., 197 Wn.2d at 887.

The ICWA statute, 25 U.S.C. § 1912(d), provides the following regarding active efforts:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

Similarly, the WICWA statute, RCW 13.38.130(1), provides,

> A party seeking to effect an involuntary foster care placement of or the involuntary termination of parental rights to an Indian child shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

ICWA requires the court "to evaluate the Department's provision of active efforts" throughout the dependency, from "foster care placement hearings and termination hearings." Matter of Dependency of G.J.A., 197 Wn.2d 868, 907, 489 P.3d 631 (2021) (citing 25 U.S.C. § 1912(d)). Further, the Bureau of Indian Affairs (BIA) recommends

11

No. 82918-1-I/12

the court "'inquire about active efforts *at every court hearing* and *actively* monitor compliance with the active efforts requirement.'" Id. (citing BUREAU OF INDIAN AFFS.,U.S. DEP'T OF INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 43 (2016), https://www.bia.gov/sites/default/files/dup/assets/bia/ois/pdf/idc2-056831.pdf. WICWA requires the court to make findings of active efforts when the child is first placed out of the home, at termination, and in any dependency proceeding where the Department is seeking continued out-of-home placement of an Indian child. RCW 13.38.040(1)(a)(i)-(iii). Further, "the Department bears the burden to demonstrate active efforts" and the court must "evaluate those efforts at every dependency proceeding where the child is placed out of the home." G.J.A., 197 Wn.2d at 907 (citing RCW 13.38.040(1)(a)(ii)); 25 U.S.C. § 1912(d).

> In order to comply with ICWA and WICWA, the Department has the burden to provide "active efforts" that are—*at a minimum*—thorough, timely, consistent, and culturally appropriate. 25 U.S.C. § 1912(d); 25 C.F.R. § 23.2; RCW 13.38.040(1)(a). The Department's actions must be thorough to "help[ ] the parents to overcome barriers, including actively assisting the parents in obtaining such services," and the Department must "monitor [the parents'] progress and participation in services." 25 C.F.R. § 23.2(2), (9). The Department cannot simply provide a referral and leave the parent to engage with providers and complete services on their own.

G.J.A., 197 Wn.2d at 891-92 (alteration in original). "'Active efforts' must be specifically 'tailored to the facts and circumstances of the case,' and the Department must act diligently to address a parent's particular needs." Id. at 892 (quoting 25 C.F.R. § 23.2)).

The majority relies on the trial court's findings of active efforts in the February dependency order and the March dispositional order. Majority at 31-32. It also points to the Department's efforts in April of 2021 when Patterson met with the father at the Hulbush Lane home and "gave [the father] a phone with minutes that the Department

12

had fully charged, activated, and preprogrammed [with] contact information including assigned DCYF worker, Upper Skagit Indian Tribe worker, Office of Assigned Council [sic], visit supervisor at the time, GAL, and chemical dependency providers." Majority at 34 (alteration in original). First, we do not defer to a trial court's conclusory findings of active efforts as that is a question of law we review de novo. Second, despite a trial court's finding that the Department engaged in active efforts, we do not accept such a finding when the evidence does not support it.

Relevant is the timing of the Department's efforts. The question before us is whether the Department engaged in active efforts *prior* to the court entering a default order of dependency and default judgment in February. The fact that the Department reached the father in April at Hulbush Lane and provided a phone with minutes, fully charged, activated, and preprogrammed with relevant contact information begs the question of why the Department did not make such efforts prior to the entry of the default dependency order.

The majority relies on a court report filed with the court after the February 16 fact-finding hearing. Majority at 33. This report includes several alleged facts that were not testified to on the record (i.e. Department put in referral for phone bundle for father after case conference; attempts have been made to engage parents by "visits to last known addresses" and "visits to known locations."). It is not clear when the visits were made, who made the visits, or if the visits only are in reference to the Patterson's January 19 service of process attempt or visits to the hospital. The court report was submitted by Patterson but was not under declaration. The only reference the court made to the court report was at the disposition hearing when it asked the parties present if there was

13

No. 82918-1-I/14

any objection to using the outlined services in the court report as the outline of the services in the dispositional order.  The dependency court based its dependency ruling on "heard testimony."[3]  At the fact-finding hearing, the Department called one witness, Patterson, and inquired about her contact with the parents.

> Q.     What contact have you had with the mother and alleged father at this point?
> A.     I have made multiple attempts to contact the father through the different Facebook accounts I was able to find for him.
>        I've tried calling him and texting him through the information that came up through the parent locator, as well as what the hospital records had for him when the child was born.
>        I have tried to meet with him in person.  I was able to talk with him during the case conference that we had.
>        And then for the mother, the same efforts with the same parameters.  For both parents, I have also sent out letters to all the different possible addresses that have come up for them.
>        And I have talked with her on the phone.  I met with her in person, and I've talked with her on Facebook, well, typed with her.
> Q.     Okay.  Thank you.
>        And [Keeghan] also mentioned that she's reached out to them as recently as today to remind them or to ask if they were planning to appear for court.  Have you had similar efforts to communicate with them and let them know when court was scheduled?
> A.     Yes.  At the case conference that we had, the father indicated that the best way to contact him would be through [the mother], and she had agreed that her phone would be able to be used for that purpose.  So I texted [the mother's] phone with the information on how to get into court as well as messaged on Facebook.

---

[3] Notably, the court entered the disposition order without hearing any testimony from a qualified expert witness.  The order noted that "the facts establish by clear, cogent and convincing evidence, including the testimony of a qualified expert witness, that continued custody of the child by the" mother and father "is likely to result in serious emotional or physical damage to the child. RESERVED FOR QEW TESTIMONY OR FILING OF DECLARATION." Ten days later, Keeghan, the tribal representative, filed a declaration as the qualified expert witness stating that G.M.W.'s placement in a foster home was approved by the tribe.  Nothing in the record indicates that the court reviewed the declaration after the order was entered or amended the disposition order.

14

Despite the trial court finding that the Department "attempted through all possible forms of communication to establish and maintain contact with the parents," the record does not support that finding.

The mother and father were called into the case conference meeting together. While the father indicated the best way to reach him was through the mother, there is no indication that the Department explained to the father the Department could arrange for him to have his own cell phone, which the Department did not do until April—after the default order was entered.

Aside from the case conference where the parents appeared by telephone, the Department never established contact with the father prior to the entry of the default order and its attempts at doing so were limited to mailings, messaging via Facebook, and hoping to reach the father through the mother. Nothing in the record established that any of the Facebook profiles the Department found with the father's name actually belonged to the father. Also, the Department acknowledged that it appeared on Facebook that its posted messages had not been read.

The record does not establish that Patterson, during the case conference, attempted to arrange to meet the father or offer to provide rides to the father to help facilitate obtaining services. During the fact-finding hearing, Patterson testified that she "tried to meet with him in person," but did not elaborate on the circumstances, the frequency, or if it was in reference to the single attempt at service of process in person. Again, the Department conceded at oral argument that nothing in the record established that the Department went to Hulbush Lane before the entry of the default order other

15

than the initial service attempt on January 19. Wash. Court of Appeals oral argument, supra, at 9 min., 55 sec. through 10 min., 01 sec.

It is the Department's burden to demonstrate active efforts, and the court must evaluate those efforts at each proceeding the child is "out of the home." G.J.A., 197 Wn.2d at 907 (citing RCW 13.38.040(1)(a)(ii); 25 U.S.C. § 1912(d). Substantial evidence did not support the court's finding that the Department engaged in active efforts as to the father prior to the entry of the default orders. The Department cannot presume that the mother and the father will maintain the same defenses in a proceeding and consider it sufficient to depend on one parent to pass along information to the other parent. It is not beyond reason that parents may disagree whether to contest dependency. K.N.J., 151 Wn. App. at 311.

CONCLUSION

Because the Department did not properly serve the father in violation of RCW 13.34.070(8), (9), I would reverse the trial court's denial of the motion to vacate the default dependency and default disposition orders and remand for further proceedings. Even if service was proper, I would reverse because the Department failed to engage in active efforts in violation of WICWA and ICWA and remand for further proceedings. For these reasons, I respectfully dissent.

Coburn, J.